**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

HUMAN RIGHTS DEFENSE CENTER,
a not-for-profit corporation,

Case No.:

Plaintiff,

v.

JURY TRIAL DEMANDED

BOARD OF COUNTY COMMISSIONERS FOR
STRAFFORD COUNTY, NEW HAMPSHIRE;
RAYMOND F. BOWER, County Administrator,
individually and in his official capacity;
CHRISTOPHER BRACKETT, Superintendent,
individually and in his official capacity; and
JOHN AND JANE DOES 1-10, Staff,
individually and in their official capacities,

Defendants.

## COMPLAINT

### I. INTRODUCTION

1.    For decades, the United States Supreme Court has recognized that the freedom
to read and correspond with the outside world while incarcerated carries
important benefits to both prisoners and society as a whole. To this end,
Plaintiff, the Human Rights Defense Center ("HRDC" or "Plaintiff"), provides
incarcerated persons across the United States with publications about their
legal and civil rights, as well as options for accessing education while
incarcerated. Defendants' policies and practices, however, frustrate that

1

mission by unconstitutionally prohibiting delivery of Plaintiff's publications to prisoners housed in the Strafford County House of Corrections ("Jail") in Dover, New Hampshire, in violation of the First Amendment to the United States Constitution. Defendants' policies and practices also deny due process of law to senders, such as Plaintiff, whose mail is censored by failing to provide notice of and an opportunity to challenge each instance of censorship as required by the Fourteenth Amendment to the United States Constitution. HRDC brings this action to enjoin Defendants' censorship of its books and magazines sent to prisoners held in the Jail, and to require Defendants to provide due process when they reject items sent to prisoners at the facility.

## II. JURISDICTION AND VENUE

2. This suit is brought under 42 U.S.C. § 1331 (federal question), as this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 (civil rights), as this action seeks redress for civil rights violations under 42 U.S.C. § 1983.

3. Venue is proper under 28 U.S.C. § 1391(b). At least one Defendant resides within this judicial district and the events giving rise to the claims asserted here all occurred within this judicial district.

4. HRDC's claims for relief are brought under 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the Constitution and laws of the United States.

5.  This Court has jurisdiction over claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and this Court also has jurisdiction to award damages against all Defendants.

6.  HRDC's claim for attorneys' fees and costs derives from 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought under 42 U.S.C. § 1983.

### III. PARTIES

7.  The Human Rights Defense Center is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the state of Washington and with principal offices in Lake Worth, Florida. The purpose of HRDC is to educate prisoners and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons to society. HRDC accomplishes its mission through advocacy, litigation, and the publication and distribution of books, magazines, and other information related to prisons and prisoner rights.

8.  Defendant Board of County Commissioners for Strafford County ("Strafford County") is the governing body for Strafford County, a unit of government organized and existing under the laws of the State of New Hampshire. The County operates the Jail, and is and was responsible for adopting and implementing policies governing incoming mail and publications for prisoners at that facility.

9.     Defendant Raymond F. Bower has been Defendant Strafford County's appointed County Administrator at all times relevant to this matter. Defendant Brower is Strafford County's employee. As the county's chief executive officer, Defendant Bower enacts Defendant Strafford County's decisions and makes operational decisions for the management of the Strafford County Department of Corrections, including Jail operations. He is sued in his individual and official capacities.

10.    Defendant Christopher Brackett was appointed by Strafford County in 2018 as Superintendent of the Strafford County Department of Corrections, which operates the Jail. Defendant Brackett had been acting superintendent since December 2015. Defendant Brackett is employed by and is an agent of Strafford County, and is responsible for the overall management of the Jail. He has ultimate responsibility for the promulgation and enforcement of all Jail policies, practices, and procedures, including the policies, practices, and procedures relating to mail and the reading material that is available to prisoners. He is sued in his individual and official capacities.

11.    The true names and identities of Defendants John and Jane Does 1 through 10 are unknown to HRDC. Each of Defendants Does 1 through 10 are or were employed by and are or were agents of Defendants and were personally involved in the adoption and/or implementation of the publications and mail policies at the Jail. They are sued in their individual and official capacities.

12.   At all times material to this action, the actions of all Defendants as alleged here were taken under the authority and color of state law.

### IV. FACTUAL ALLEGATIONS

### A.    HRDC's Mission and Outreach to Detention Facilities

13.   For more than 30 years, HRDC's mission has been public education, advocacy and outreach on behalf of, and to assist, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights. HRDC's mission, if realized, enhances public safety.

14.   To accomplish its mission, HRDC publishes and distributes books, magazines, and other materials containing news and analysis about prisons, jails, and other detention facilities, prisoners' rights, court rulings, management of prison facilities, prison conditions, and other matters pertaining to the rights and interests of incarcerated individuals.

15.   HRDC has thousands of customers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and members of the general public. Since its creation in 1990, HRDC has sent its publications to prisoners and law librarians in more than 3,000 correctional facilities located across all fifty states, including the Federal Bureau of Prisons and various facilities within the State of New Hampshire, such as FCI Berlin, the Secure Psychiatric Unit, and the NH State Prison for Men.

16.   HRDC publishes and distributes a 72-page monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains news and

analysis about prisons, jails, and other detention facilities, prisoners' rights, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and interests of incarcerated individuals. In 2013, *Prison Legal News* received the First Amendment Award from the Society of Professional Journalists.

17.    More recently, HRDC also began publishing a second monthly magazine, *Criminal Legal News.* This magazine focuses on review and analysis of individual rights, court rulings, and news about criminal justice-related issues.

18.    HRDC also publishes and distributes dozens of different softcover books about the criminal justice system, legal reference books, and self-help books of interest to prisoners. These books are designed to foster a better understanding of criminal justice policies and to allow prisoners to educate themselves about related issues, such as legal research, how to write a business letter, health care issues, and similar topics. Pertinent to this case, HRDC publishes and distributes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Guerilla Handbook*"), which provides prisoners information on enrolling at accredited higher educational, vocational and training schools. HRDC is also the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections, and legal remedies available to prisoners concerning their incarceration.

**B.**     **The Jail**

19.     Defendant Strafford County has operated the Jail at its current location since 2004.

20.     The approximately 500-bed facility houses male and female prisoners who are detained prior to trial or serving sentences. In addition to Strafford County prisoners, the Jail also houses prisoners through agreements with the United States Marshals Service, Immigration and Customs Enforcement, New Hampshire Department of Corrections, and other New Hampshire counties.

21.     In early 2017, Defendants expanded the services offered at the Jail by Global Tel-Link (GTL). Defendants effectively replaced most channels of communication between prisoners and their family and friends with paid services offered by GTL.

22.     Jail staff were the focus of a 2017 multiagency investigation into the smuggling of drugs and other contraband. The criminal investigation confirmed that Jail staff were among the people carrying contraband into the Jail.

23.     Upon information and belief, the Jail has removed hard copy books from its law library for prisoners.

24.     Upon information and belief, the Jail allows some prisoners to receive spiritual and religious books.

25.     Upon information and belief, the Jail allows some prisoners to receive written materials as part of correspondence course work.

26.     Upon information and belief, the Jail has a full-body scanner that it uses to

scan work-release prisoners when they return to the Jail.

###     C.     Defendants' Unconstitutional Policies and Practices

27.     On or about June 12, 2017, Defendants eliminated nearly all incoming prisoner

mail.

28.     Defendants previously published on the Jail's webpage a copy of a letter from

Defendant Brackett explaining the policy:

> NOTICE:
>
> To: Members of the Public
> From: The Strafford County Department of Correction
> Date: June 12, 2017
> Re: Returned Mail
>
> You have received this returned letter due to a recent change in
> policy at the Strafford County Department of Corrections. After
> careful consideration, the Department of Corrections will no
> longer accept incoming personal inmate mail.
>
> This change in policy is effective immediately and has been
> implemented to increase the safety and security of all inmates
> and staff at this facility.
>
> You can still correspond with those incarcerated via electronic
> messaging (email). You can learn more about this service at:
> www.connectnetwork.com
>
> Those families that send money orders to the facility through
> mail must address the envelope to:
>
> Strafford County Commissary
> 266 County Farm Road
> Dover, NH 03820
>
> We apologize for any inconvenience these changes may cause for
> you and your family.
> Sincerely,

Christopher Brackett
Superintendent

29. When Defendants announced the policy change, they claimed that the Jail would place incoming prisoner mail inside an envelope and return it to the sender with instructions on how to communicate with the prisoner electronically.

30. Before that policy's introduction, prisoners at the Jail had attempted to subscribe to *Prison Legal News* and ordered books. Those attempts were not always successful. Some items mailed to the Jail were returned without explanation and HRDC received reports from prisoners that other items failed to reach them.

31. At a Strafford County public meeting that followed implementation of the new mail policies, Defendant Brackett claimed that the mail restrictions were needed to prevent contraband from entering the jail through personal mail. Defendant Brackett told the meeting that three non-fatal drug overdoses on June 6, 2017 were the result of drugs being smuggled in by mail, and not by Jail staff.

32. Defendants, however, had been planning the policy change for months before the June 6, 2017 overdoses, as part of the Jail's introduction of GTL tablets.

33. Defendant Strafford County later claimed that the new mail restrictions succeeded in ending the contraband problem: "We took several bold moves in our battle to stop illegal drugs from coming into the House of Corrections (HOC) through the mail in 2018. Early in the year, we stopped all inmate

9

personal mail from coming into the facility by substituting corrections style, limited, e-mail correspondence." The claim, in Defendant Strafford County's 2018 Annual Report, did not acknowledge that Jail staff were the source of illegal drugs inside the Jail, nor that Jail staff had been prosecuted for such criminal conduct.

34.    During the June 29, 2017, public meeting when Defendants announced the new mail policy, Defendant Brackett

> responded to a question stating that it is not reasonable to believe that any measures we take will eliminate the potential of something like this happening again. We are working to prevent any and all contraband from entering the facility, but as soon as we develop a new method to discover it, a new method of getting it in is developed.[1]

35.    Upon information and belief, Defendants adopted the mail policy changes with knowledge of a lawsuit pending against the New Hampshire Department of Corrections over its mail policies.

36.    Defendant Brackett told Strafford County at the June 29, 2017 public meeting that the new policies sufficiently protected prisoners' rights. There was no discussion of the impact of the policy changes on publishers' rights.

37.    The Jail's website no longer displays the notice of the 2017 mail policy change.

---

[1] Strafford County Commissioners Public Hearing and Meeting Minutes for Thursday, June 29, 2017, ¶ 9 [PDF 43], https://co.strafford.nh.us/images/UploadedFiles/Commisioners/Commissioners_Meeting_Minutes_2017.pdf.

38.   Instead, the Jail's web page, on a page for frequently asked questions, states: "We do not accept any mail for inmates without prior approval[.]"[2]

39.   The Jail's web page does not explain what policies currently apply to publishers sending books and magazines to prisoners.

40.   The prisoner mail policy is both unconstitutional on its face and as applied.

D.      **HRDC's Attempts to Communicate with Prisoners**

41.   Defendants' implementation of their policies to HRDC's mailings to inmates, described below, has been both impermissibly restrictive and unevenly applied. These actions constitute a de facto ban on HRDC's materials sent to prisoners at the Jail, in violation of the Free Speech Clause of the First Amendment. Moreover, Defendants' failure to provide HRDC notice and an opportunity to appeal the censorship of its mail to prisoners violates HRDC's Fourteenth Amendment rights to due process.

42.   Shortly after the mail restrictions were implemented in 2017, prisoners contacted HRDC to report that the Jail had banned all incoming mail and to seek HRDC's legal assistance.

43.   HRDC tried to ascertain how the announced policies would be applied to publishers. HRDC attempted to mail correspondence, books, and magazines to

---

[2] In June 2018, Defendants altered their policy for handling privileged legal mail, which was exempted from the ban on personal mail. Jail staff will open all legal mail, photocopy the contents, give the copy to the prisoner, and destroy the original contents in the presence of the prisoner. A notice from Defendant Brackett about that policy change appears on the Jail's webpage.

several prisoners at the Jail in 2017. The Jail returned a few items using the U.S.P.S. return to sender service. The items were not marked in any way that would indicate why the Jail had returned them. In some cases, the returned items had been mailed to prisoners who were no longer in custody; in others, the prisoner was still in custody on the date HRDC received the returned items. Prisoners reported that the Jail rejected many of HRDC's mailings, but HRDC does not know the precise total or the Jail's reasons for any rejections for in-custody prisoners, due to the Jail's policy and practice of not notifying publishers about such rejections.

44.  In June and July 2017, HRDC attempted to mail items to eight prisoners at the Jail. HRDC sent the prisoners four separate mailings: (1) an envelope containing the May or June 2017 issue of *Prison Legal News*; (2) a package containing *The Habeas Citebook: Ineffective Assistance of Counsel*, a softcover book; (3) an envelope containing the court ruling in *Clement v. California Dept. of Corrections*; and, (4) an envelope containing an informational brochure about HRDC's publications.

45.  HRDC sent each prisoner a follow-up letter describing the items that were sent and asking the prisoner to confirm their receipt. The envelope contained a self-addressed, stamped envelope.

46.  HRDC also gave each of the eight prisoners a complimentary, nine-month subscription to *Prison Legal News*. In addition to the nine issues, HRDC also

sent each prisoner two letters reminding them to renew their subscription and notifying them of its expiration.

47. One prisoner wrote back saying he had only received the follow-up letter. Three other prisoners responded that they had received only *The Habeas Citebook*.

48. HRDC did not receive any of the June-July 2017 outreach items through the U.S.P.S. return to sender service.

49. Defendants did not otherwise return any items to HRDC with an explanation for why they were rejected, what alternatives HRDC had to communicate with prisoners, or how that rejection could be appealed.

50. HRDC later received some returned magazines that had been mailed to some of these prisoners after they were no longer in custody at the Jail.

51. In August 2017, HRDC attempted to mail the same four kinds of items to seven additional prisoners at the Jail.

52. As with the June-July outreach, HRDC gave each prisoner a nine-month subscription to *Prison Legal News* and mailed three subscription-related letters to each.

53. HRDC also sent each prisoner a follow-up letter through legal mail describing the items that were sent and asking the prisoner to confirm their receipt. The envelope contained a self-addressed, stamped envelope.

54. One prisoner wrote back to say he had received all of the items. Another said he received everything except the self-addressed stamped envelope included with the follow-up letter.

13

55. The Jail returned four of the August 2017 mailings to HRDC through the U.S.P.S. return to sender service: the court ruling mailed to one prisoner and a court ruling, informational brochure, and *Prison Legal News* mailed to another. At the time, both prisoners were still in custody.

56. In October 2017, HRDC attempted to mail items to sixteen additional prisoners. The outreach consisted of the October issue of *Prison Legal News*, *The Habeas Citebook*, the court ruling, and an informational brochure. HRDC also mailed follow-up letters to see if the prisoners received the materials.

57. Each prisoner was given a nine-month complimentary subscription to *Prison Legal News*, starting with the November issue. HRDC also mailed three subscription-related letters to each prisoner.

58. The Jail returned some of these October mailings to HRDC through the U.S.P.S. return to sender service. Some of those prisoners were no longer in custody. The Jail did not return all mailings sent to those prisoners.

59. In November 2017, the Jail returned the book and follow-up letter that were mailed to one of the prisoners in October. The prisoner was still in custody.

60. Also in November 2017, the Jail returned two issues of *Prison Legal News* that were sent to another prisoner. The prisoner was still in custody.

61. In 2018, HRDC did not attempt any additional outreach. HRDC only received mailings returned from the Jail that had been sent to prisoners no longer in custody. Prisoners continued to contact HRDC for assistance with the mail restrictions.

62. In 2019, HRDC again attempted to ascertain how the Jail was treating mailings sent by publishers. In January 2019, HRDC separately mailed to two additional prisoners. HRDC sent the following items: (1) *The Habeas Citebook*; (2) another softcover book, *Protecting Your Health and Safety*; (3) the December 2018 issue of *Prison Legal News*; (4) the December 2018 issue of *Criminal Legal News*; (5) a court ruling; and (6) an informational brochure.

63. HRDC also gave both prisoners a complimentary nine-month subscription to *Prison Legal News* and six-month subscription to *Criminal Legal News* and mailed correspondence related to these subscriptions.

64. In April 2019, HRDC mailed both prisoners a follow-up letter to confirm that they had received the mailings.

65. One of the prisoners contacted HRDC to say Jail staff had held his magazines and books pending a decision about whether to give them to the prisoner. The follow-up letter mailed to him was returned because he was no longer in custody. It is unclear if he ever received the items mailed while he was at the Jail, or if the other prisoner received his.

66. In May 2019, a prisoner contacted HRDC to request complimentary copies of their publications. HRDC mailed him the two softcover books, the May issue of *Prison Legal News* and *Criminal Legal News*, the court ruling, and an informational brochure to another prisoner. HRDC also gave him a six-month complimentary subscription to *Criminal Legal News* and a nine-month subscription to *Prison Legal News*. HRDC mailed him five issues of *Prison*

15

*Legal News*, four issues of *Criminal Legal News*, and two subscription-related letters before an item was returned in October 2019 because he was no longer in custody.

67. In 2020, prisoners continued to write HRDC to complain about the mail policies and that the Jail had closed its law library.

68. In November 2020, HRDC again tried to ascertain how the Jail's mail policies were being applied to publishers. HRDC mailed items to five prisoners. HRDC sent each: (1) *Protecting Your Health and Safety*; (2) *Prisoner's Guerilla Handbook*; (3) a sample copy of *Prison Legal News*; (4) a sample copy of *Criminal Legal News*; (5) a court ruling; and (6) an informational brochure. Each item was mailed separately and addressed to an individual prisoner.

69. All ten books were returned to HRDC through the return to sender service. All of the intended recipients were in the Jail's custody at that time.

70. Defendants failed to provide HRDC any notice or opportunity to appeal these censorship decisions.

71. None of the other November mailings were returned to HRDC.

72. HRDC later sent all but one of the prisoners a follow-up letter.

73. HRDC received only one reply, from a prisoner who said he had not received any of our mailings. On the back of one of the pages of the prisoner's letter was written, apparently in a different hand, "approved spiritual books for [the prisoner]."

74. HRDC gave the five prisoners a six-month complimentary subscription to *Criminal Legal News* and a nine-month complimentary subscription to *Prison Legal News* and mailed subscription-related correspondence. No magazines were returned to HRDC.

75. The only subscription-related letter returned to HRDC was one prisoner's last-chance renewal letter for *Criminal Legal News*, which arrived at the Jail after she was no longer in custody there.

76. HRDC also attempted to mail magazines to a prisoner whose subscriptions began while he was held at the Merrimack County Jail.

77. None of the five issues of *Prison Legal News* that HRDC mailed to the prisoner at the Jail were returned to HRDC.

78. The prisoner mailed HRDC a letter complaining that he had not received his magazines.

79. He included a copy of a grievance form signed by Jail staff on June 18, 2021.

80. Jail staff had responded to his grievance about nonreceipt of his magazine subscription by writing that the subscription had not been approved and that "official policy states no newspapers, magazines, or outside mail." (emphasis in original)

81. Defendants' policies and practices constitute a de facto ban on HRDC's books, magazines, and other correspondence sent to prisoners at the Jail. As a result, Defendants' publications policies and practices violate HRDC's rights under the Free Speech Clause of the First Amendment.

17

82.    Furthermore, Defendants engage in policies and practices that fail to provide senders of censored mail notice and an opportunity to appeal the censorship of the mail to the intended prisoner. Thus, such policies and practices violate HRDC's Fourteenth Amendment rights to due process.

83.    Because of Defendants' actions as described above, HRDC has suffered damages, and will continue to suffer damages, including, but not limited to: the suppression of HRDC's speech; the impediment of HRDC's ability to disseminate its political message; frustration of HRDC's nonprofit organizational mission; the loss of potential subscribers and customers; and, the inability to recruit new subscribers and supporters.

84.    Defendants, and other agents of the Jail, are responsible for or personally participated in creating and implementing these unconstitutional policies, practices, and customs, or for ratifying or adopting them. Further, Defendants are responsible for training and supervising the staff persons whose conduct has injured and continues to injure HRDC.

85.    Defendants' actions and inactions were and are impermissibly motivated, and were and are all committed under color of law with deliberate indifference to HRDC's rights.

86.    Plaintiff will continue to send its books and magazines to subscribers, customers, and other individuals imprisoned at the Jail.

87.    Defendants' unconstitutional policy, practices, and customs continue to violate HRDC's rights, and were and are the moving force behind the injuries HRDC

suffered as a direct result of the constitutional violations. As a result, HRDC has no adequate remedy at law.

88.   Without relief from this Court, HRDC will suffer irreparable injury, since its fundamental free speech and due process rights are being denied. The balance of hardships favors Plaintiff and the public interest will be served by granting injunctive and declaratory relief.

89.   The accommodation of the free speech and due process rights of HRDC with respect to written speech protected by the Constitution will not significantly impact the Jail, its staff, or prisoners.

90.   HRDC is entitled to declaratory relief as well as injunctive relief prohibiting Defendants from refusing to deliver publications from HRDC and other senders without legal justification, and prohibiting Defendants from censoring mail without due process of law.

## V.   CLAIMS

### Count I – 42 U.S.C. § 1983

#### *Violation of the First Amendment (Free Speech)*

91.   HRDC re-alleges and incorporates the allegations of Paragraphs 1 through 90 of the Complaint as if fully set forth herein.

92.   The acts described above constitute violations of HRDC's right to communicate with incarcerated individuals under the Free Speech Clause of the First Amendment.

93. Defendants' conduct was objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

94. HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by the policies and practices of Defendants, which were and are the moving force of the violations.

95. Defendants' acts described above have caused damages to HRDC, and if not enjoined, will continue to cause damage to HRDC.

96. HRDC seeks declaratory and injunctive relief, and nominal and compensatory damages against all Defendants. HRDC seeks punitive damages against the individual Defendants in their individual capacities.

**Count II – 42 U.S.C. § 1983**

***Violation of the Fourteenth Amendment (Due Process)***

97. HRDC re-alleges and incorporates the allegations of Paragraphs 1 through 96 of the Complaint as if fully set forth herein.

98. Because HRDC has a liberty interest in communicating with prisoners, HRDC has a right under the Due Process Clause of the Fourteenth Amendment to receive notice of and an opportunity to appeal Defendants' decisions to censor their written speech.

99. Defendants' policies and practices fail to provide HRDC and other senders with adequate notice and an opportunity to be heard.

100. Defendants' conduct was objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

101. HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by the policies and practices of Defendants, which are and were the moving force of the violations.

102. Defendants' acts described above have caused damages to HRDC, and if not enjoined, will continue to cause damage to HRDC.

103. HRDC seeks declaratory and injunctive relief, and nominal and compensatory damages against all Defendants. HRDC seeks punitive damages against the individual Defendants in their individual capacities.

## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

104. A declaration that Defendants' policies and practices violate the Constitution.

105. A preliminary and permanent injunction preventing Defendants from continuing to violate the Constitution, and providing other equitable relief.

106. Nominal damages for each violation of HRDC's rights by the Defendants.

107. Compensatory damages in an amount to be proved at trial.

108. Punitive damages against the individual Defendants in an amount to be proved at trial.

109. Costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988, and under other applicable law.

21

110.   Any other such relief that this Court considers just and equitable.

## VII.   JURY DEMAND

Plaintiff, Human Rights Defense Center, by and through its attorneys, hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:         March 11, 2022                    Respectfully Submitted,

                                                 Attorneys for Plaintiff Human Rights
                                                 Defense Center

                                                 */s/ Edward J. Sackman*

                                                 Edward J. Sackman, Bar No. 19586
                                                 Matthew Miller, Bar. No. 271594
                                                 670 N. Commercial Street, Suite 108
                                                 P.O. Box 1120
                                                 Manchester, New Hampshire 03105
                                                 (603) 623-8700
                                                 nsackman@bernsteinshur.com
                                                 mmiller@bernsteinshur.com

                                                 Jesse W. Isom, Fla. Bar No.: 98588*
                                                 jwisom@humanrightsdefensecenter.org
                                                 Daniel Marshall, Fla. Bar No.: 617210*
                                                 dmarshall@humanrightsdefensecenter.org
                                                 HUMAN RIGHTS DEFENSE CENTER
                                                 P.O. Box 1151
                                                 Lake Worth, FL 33460
                                                 Telephone: (561) 360-2523
                                                 Facsimile: (561) 828-8166

                                                 *Pro hac vice* applications to be filed