## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Human Rights Defense Center, | |
|    Plaintiff, | |
| v. | Case No.: |
| Board of County Commissioners for Strafford County, *et al.*, | |
|    Defendants. | |

## **Plaintiff's Memorandum in Support of Motion for Preliminary Injunction**

Plaintiff, Human Rights Defense Center ("HRDC"), moves for a preliminary injunction under Federal Rule of Civil Procedure 65, to enjoin the Board of County Commissioners for Strafford County, New Hampshire ("Strafford County"); the County Administrator, Raymond F. Bower ("Bower"); the Strafford County Department of Corrections Superintendent, Christopher Brackett ("Brackett"); and Does 1–10 (collectively, "Defendants") from unconstitutionally censoring HRDC's publications and correspondence and denying due process to challenge such decisions.

To remedy these constitutional violations, HRDC requests that this Court enter a preliminary injunction: (1) prohibiting Defendants from illegally censoring HRDC's publications and correspondence sent to incarcerated persons in the Strafford County House of Corrections ("Jail"), and (2) requiring that Defendants provide HRDC with adequate notice of the reasons for any rejections of its mailings and an opportunity to be heard before such rejections take place.

STATEMENT OF FACTS

**A. HRDC sent publications and correspondence to incarcerated persons at the Jail as part of its core mission.**

HRDC is a 501(c)(3) nonprofit charitable organization incorporated in the state of Washington with principal offices in Lake Worth, Florida. *See* Ex. 1, Declaration of Paul Wright in Support of Motion for Injunctive Relief ("Wright Decl.") ¶ 2. For more than 30 years, HRDC has focused its mission on public education, advocacy, and outreach on behalf of incarcerated persons whose rights have been infringed. *Id.* In furtherance of its mission, HRDC mails outreach materials to individuals held in prisons and jails across the United States. *Id.* ¶ 10. The primary aim is to communicate about legal developments related to the protection of one's health and personal safety while incarcerated. Reading materials also help detainees be productive, avoid conflict, and prepare for release back into society. *Id.* ¶ 14.

Since its creation in 1990, HRDC has mailed its publications to prisoners and law librarians in more than 3,000 correctional facilities across all 50 states, including facilities in New Hampshire like FCI Berlin, the Hillsborough County House of Corrections, the Secure Psychiatric Unit, and the NH State Prison for Men. *Id.* ¶ 12.

HRDC publishes *Prison Legal News* ("*PLN*"), a 72-page magazine of news and analysis about the rights of the incarcerated. *Id.* ¶ 4. HRDC also publishes *Criminal Legal News* ("*CLN*"), a 56-page magazine focused on criminal justice-related issues. *Id.* ¶ 5. The monthly magazines give prisoners in-depth coverage of judicial decisions and recent events in a way possible only through a print publication. To have value, it is essential that the magazines be delivered in a timely manner. *Id.* ¶ 6.

2

HRDC also publishes and distributes soft-cover books, like *The Habeas Citebook: Ineffective Assistance of Counsel* ("*THC*"), which explains federal habeas corpus litigation based on ineffective assistance of counsel. HRDC also publishes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*PGH*"), which provides information on enrolling in educational programs. And HRDC is the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"), which describes prisoners' rights and legal remedies. *Id.* at ¶ 7.

Since 2017, HRDC has mailed items to prisoners at the Jail several times to determine how Defendants apply their policies to publishers. Wright Decl. ¶¶ 20-25. HRDC's outreach followed the Jail's announcement of a new mail policy on or about June 12, 2017. *Id.* ¶ 20. Defendants published, on the Jail's webpage, a copy of a letter from Defendant Brackett explaining the policy:

> NOTICE:
>
> To: Members of the Public
> From: The Strafford County Department of Correction
> Date: June 12, 2017
> Re: Returned Mail
>
> You have received this returned letter due to a recent change in policy at the Strafford County Department of Corrections. After careful consideration, the Department of Corrections will no longer accept incoming personal inmate mail.
>
> This change in policy is effective immediately and has been implemented to increase the safety and security of all inmates and staff at this facility.
>
> You can still correspond with those incarcerated via electronic messaging (email). You can learn more about this service at: www.connectnetwork.com

Those families that send money orders to the facility through mail must address the envelope to:

Strafford County Commissary
266 County Farm Road
Dover, NH 03820

We apologize for any inconvenience these changes may cause for you and your family.
Sincerely,
Christopher Brackett
Superintendent

*Id.* ¶ 18. When Defendants announced the policy change, they claimed that the Jail would place incoming prisoner mail inside an envelope and return it to the sender with instructions on how to communicate with the prisoner electronically.[1]

At a Strafford County public meeting that followed implementation of the new mail policies, Defendant Brackett claimed that the mail restrictions were needed to prevent contraband from entering the jail through personal mail, following three non-fatal drug overdoses on June 6, 2017.[2] Defendants, however, had been planning the policy change for months before the June 6, 2017 overdoses, as part of the Jail's introduction of GTL tablets.[3] Defendant Strafford County later claimed that the new

---

[1] Brian Early, *Jail ceases incoming personal mail for inmates*, Foster's Daily Democrat, June 12, 2017, https://www.fosters.com/story/news/2017/06/13/jail-ceases-incoming-personal-mail-for-inmates/20605924007/.

[2] *Id.*; *see also* Strafford County Commissioners Public Hearing and Meeting Minutes for Thursday, June 29, 2017, ¶ 9, https://co.strafford.nh.us/images/UploadedFiles/Commisioners/Commissioners_Meeting_Minutes_2017.pdf.

[3] Early, *supra* note 1; Jason Moon, *After Multiple Inmate Overdoses, Strafford County Jail Bans Incoming Mail*, New Hampshire Public Radio, June 13, 2017, https://www.nhpr.org/nh-news/2017-06-13/after-multiple-inmate-overdoses-

mail restrictions succeeded in ending the contraband problem: "We took several bold moves in our battle to stop illegal drugs from coming into the House of Corrections (HOC) through the mail in 2018. Early in the year, we stopped all inmate personal mail from coming into the facility by substituting corrections style, limited, e-mail correspondence."[4] The claim, in Defendant Strafford County's 2018 Annual Report, did not acknowledge that Jail staff were a source of illegal drugs inside the Jail, nor that Jail staff had been prosecuted for such criminal conduct.

During the June 29, 2017, public meeting when Defendants announced the new mail policy, Defendant Brackett

> responded to a question stating that it is not reasonable to believe that any measures we take will eliminate the potential of something like this happening again. We are working to prevent any and all contraband from entering the facility, but as soon as we develop a new method to discover it, a new method of getting it in is developed.[5]

Upon information and belief, Defendants adopted the mail policy changes with knowledge of a pending lawsuit against the New Hampshire Department of Corrections over its mail policies. Defendant Brackett told Strafford County at the

---

strafford-county-jail-bans-incoming-mail#stream/0; *see also* Strafford County Commissioners Public Meeting Minutes for Wednesday, June 15, 2016, ¶ 2, https://co.strafford.nh.us/images/UploadedFiles/Commisioners/Commissioners_Meeting_Minutes_2016.pdf.

[4] Strafford County 2018 Annual Report, at 5, https://www.co.strafford.nh.us/images/UploadedFiles/Commisioners/County_Annual_Report_2018.pdf.

[5] Strafford County Commissioners Public Hearing and Meeting Minutes for Thursday, June 29, 2017, *supra* note 2.

June 29, 2017 public meeting that the new policies sufficiently protected prisoners' rights.[6] There was no discussion of the impact of the policy changes on publishers' rights.[7]

The Jail's website no longer displays the notice of the 2017 mail policy change. Wright Decl. ¶ 18. The Jail's homepage displays the following small notice:[8]

> We no longer accept donated books.  Items may not be mailed in to the facility; inmates may access reading materials through the tablet system.  Items mailed to the facility will be returned to sender.
>
> This is for safety and security reasons.

On a page for frequently asked questions, the Jail's website states: "We do not accept any mail for inmates without prior approval[.]"[9] The Jail's web site does not explain what policies currently apply to publishers sending books and magazines to prisoners.

Before the 2017 policy's introduction, prisoners at the Jail had attempted to subscribe to *Prison Legal News* and ordered books. Wright Decl. ¶ 17. Those attempts were not always successful. *Id*. Some items mailed to the Jail were returned without explanation. *Id*. And HRDC received reports from prisoners that other items failed to reach them. *Id*.

Shortly after the mail restrictions were implemented in 2017, prisoners contacted

---

[6] Strafford County Commissioners Public Hearing and Meeting Minutes for Thursday, June 29, 2017, *supra* note 2.

[7] *Id*.

[8] Viewed 2/14/2022 at https://www.co.strafford.nh.us/jail-home-page.

[9] Viewed 2/14/2022 at https://www.co.strafford.nh.us/frequently-asked-questions.

HRDC to report that the Jail had banned all incoming mail and to seek HRDC's legal assistance. *See* Wright Decl. ¶ 19. HRDC tried to ascertain how the announced policies would be applied to publishers. *Id*. ¶¶ 20-25. The Jail's mail-restriction policy has been unevenly applied. The Jail returned a few items using the U.S.P.S. return to sender service. The items were not marked in any way that would indicate why the Jail had returned them. In some cases, the returned items had been mailed to prisoners who were no longer in custody; in others, the prisoner was still in custody on the date HRDC received the returned items. Prisoners reported that the Jail rejected many of HRDC's mailings, but HRDC does not know the precise total or the Jail's reasons for any rejections for in-custody prisoners, due to the Jail's policy and practice of not notifying publishers about such rejections.

Between June and October 2017, HRDC mailed outreach to 31 prisoners. Wright Decl. ¶ 20. HRDC mailed each (1) an issue of *PLN*, (2) a copy of *THC*, (3) a copy of *Clement v. California*, 364 F.3d 1148 (9th Cir. 2004), and (4) a brochure. *Id*. Each item was individually addressed and separately mailed. *Id*. HRDC gave these prisoners free nine-month subscriptions to *PLN*, mailing them monthly issues and subscription-related correspondence. *Id*. ¶ 21.  HRDC also mailed each inmate a follow-up letter asking them to confirm whether the received the other materials. *Id*. ¶ 20.

In 2019, HRDC again attempted to ascertain how the Jail was treating publisher mail. HRDC separately mailed to three prisoners (1) a copy of *THC*, (2) a copy of *PYHS*, (3) a sample of *PLN*; (4) a sample of *CLN*; (5) a court ruling; and, (6) a

brochure. *Id*. ¶ 22. Each item was individually addressed and separately mailed. *Id*. HRDC also gave each prisoner a complimentary nine-month subscription to *PLN* and six-month subscription to *CLN*. *Id*. ¶ 23. Pursuant to the subscriptions, HRDC mailed magazines monthly and some subscription-related correspondence. *Id*. After HRDC mailed follow-up letters in April 2019 to confirm receipt of the materials, one of them contacted HRDC and indicated that Jail staff had held the magazines and books pending a decision about whether to give them to the prisoner. *Id*. ¶ 24.

In 2020, after receiving more complaints about the mail policy, HRDC tried again to ascertain how the Jail's mail policies were being applied to publishers. *Id*. ¶ 25. In November 2020 HRDC mailed five prisoners: (1) *PYHS*; (2) *PGH*; (3) a *PLN* sample; (4) a *CLN* sample; (5) a court ruling; and (6) a brochure. *Id*. Each item was mailed separately and addressed to an individual prisoner. *Id*. HRDC also gave the five prisoners subscriptions to *PLN* (nine months) and *CLN* (six months) and mailed correspondence related to the subscriptions. *Id*. All ten books were returned to HRDC through the return to sender service. *Id*. ¶ 26. All of the intended recipients were in the Jail's custody at that time. *Id*. Defendants failed to provide HRDC any notice or opportunity to appeal these censorship decisions. *Id*. None of the other November mailings were returned to HRDC. *Id*. HRDC sent follow-up letters. *Id*. One prisoner responded, stating that he had not received any of the mailings. *Id*.[10] On the back of

---

[10] This letter, Exhibit B to the Wright Declaration, is partially redacted because it contains personal, medical information. The part of Exhibit B that supports our arguments is unredacted.

one of the pages of the prisoner's letter was written, apparently in a different hand, "approved spiritual books for [the prisoner]." *Id.*

## B. Defendants' unconstitutional mail policies and practices caused the Jail to deny prisoners HRDC's publications and correspondence.

Defendants maintain a policy or practice of denying HRDC's publications and correspondence to prisoners. There is no legitimate penological interest justifying such censorship. Without the ability to mail prisoners these items, HRDC has no way to exercise its right to communicate with incarcerated persons in the Jail.

Defendants censored and otherwise refused to allow incarcerated persons in the Jail to receive at least 39 items of mail, 19 since August 2018. These include 12 issues of *PLN*, one issue of *CLN*, 2 copies of *THC*, 5 copies of *PYHS*, 5 copies of *PGH*, 6 informational brochures, 7 court rulings, and an outreach follow-up letter. *Id.* ¶ 29. Most of these were returned to HRDC through the U.S. Postal Service's return to sender service. None were marked to explain why the Jail had rejected them or how HRDC could appeal the rejection. The addressees of the mailings included in these tallies were all in custody. *Id.* ¶ 30. Upon information and belief, the Jail has censored many other HRDC magazines that were not returned. Since 2017, HRDC has mailed prisoners at the Jail over 300 magazines, with over 100 mailed within the past three years. *Id.* ¶ 28. In addition to the issues returned in 2017, Plaintiff received letters from prisoners saying the Jail had censored other HRDC magazines. *Id.* Grievance paperwork sent to HRDC in June 2021 suggests a de facto ban is in place. *Id.* ¶ 27.[11]

---

[11] The letter containing this grievance paperwork, Exhibit C to the Wright Declaration, is partially redacted because it contains privileged information. The

In denying the grievance, Jail staff wrote that the prisoner's *PLN* subscription was unapproved and that "official policy states no <u>newspapers</u>, <u>magazines</u>, or outside mail." *Id.* (emphasis in original).[12]

Because HRDC will continue to communicate through its publications with persons confined in the Jail, *id.* ¶ 36, Defendants' policies and practices will cause irreparable harm by violating HRDC's free speech rights.

## Legal Standard

A court may issue a preliminary injunction on notice to the adverse party. Fed. R. Civ. P. 65. In considering a motion for a preliminary injunction, a court analyzes four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm absent the injunction; (3) that the burden the injunction would impose on defendants would be less than the burden on plaintiffs of denying the injunction; and (4) that the injunction would be in the public interest. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).

## Argument

HRDC moves the Court to enter a preliminary injunction prohibiting Defendants from continuing to violate Plaintiff's constitutional rights to free speech and due process. The Court should grant HRDC's motion because: (1) HRDC is likely to succeed on the merits; (2) HRDC is currently suffering and will continue to suffer

---

part of Exhibit C that supports our arguments is unredacted.

[12] In the course of related litigation, Defendant Brackett submitted a sworn declaration in which he claimed that the Jail allowed prisoners to receive newspapers and magazines. Ex. 2, Declaration of Christopher Brackett.

irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in HRDC's favor; and (4) an injunction is in the public interest.

## I.   HRDC is Likely to Succeed on the Merits of Its Claims.

### A.  First Amendment Claim

A publisher's right to send publications and other correspondence to incarcerated persons is clearly established. "[T]here is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004). Prison walls do not bar those who seek to "exercis[e] their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407 (citations omitted). HRDC's speech covers topics of great public concern and therefore "occupies the highest rung of the h[ie]rarchy of First Amendment values[.]" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks and citations omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7, 94 S.Ct. 2800, 2808 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance.").

To withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four *Turner* factors. *Turner v. Safley,* 482 U.S. 78, 89–91 (1987). The first factor a court considers in determining the validity of a prison regulation is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward

to justify it." *Turner,* 482 U.S. at 89 (internal quotation marks and citation omitted). Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (quoting *Turner*, 482 U.S. at 89–90). That is, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). In other words, while respectful of correctional officials' expertise, *Turner*'s "reasonableness standard is not toothless." *Id.* at 548 (Stevens, J., dissenting) (internal quotation marks omitted) (quoting *Thornburgh*, 490 U.S. at 414). Rather, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) (emphasis in original) (citations omitted); *see also Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989) ("[P]rison officials do not set constitutional standards by fiat.").

Defendants' policy of censoring publications fails to advance any legitimate penological objective, rendering it irrational and arbitrary. On its face, the Jail's publication policy would not prevent HRDC's books or magazines from reaching its intended recipients. Defendants have claimed that prisoners are permitted to receive publications mailed directly from a publisher, subject to screening for contraband. *See Larkin v. Brackett*, No. 19-cv-102-LM, 2020 U.S. Dist. LEXIS 35600, at *12-13

(D.N.H. Jan. 13, 2020).[13] But Jail staff reject HRDC books and magazines. Defendants' rationale for this censorship remains unknown. While Defendants introduced electronic mail to combat contraband, applying that policy to HRDC's publications is irrational, because those publications have not created security problems in the thousands of facilities where they have been delivered. Wright Decl. ¶ 13; *see also Bell v. Wolfish*, 441 U.S. 520, 549 (1979) (noting warden's testimony that "there is relatively little risk that material received directly from a publisher or book club would contain contraband"); Human Rights Def. Ctr. v. Sw. Va. Reg'l Jail Auth., No. 1:18CV00013, 2018 U.S. Dist. LEXIS 110610, at *15 (W.D. Va. July 3, 2018) ("[I]tems sent directly from publishers are unlikely to contain drugs . . . ."). In fact, Defendants' censorship of HRDC's publications and correspondence hampers the important penological objective of rehabilitating incarcerated persons. *See McKune v. Lile*, 536 U.S. 24, 36 (2002); *Procunier v. Martinez*, 416 U.S. 396, 412–13 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. 401.

The second *Turner* factor concerns whether there exist alternative means to exercising the constitutional right in question. The absence of alternatives may be evidence of an unreasonable prison regulation. *Beard*, 548 U.S. at 532 (citing *Overton*

---

[13] The magistrate judge concluded Larkin had not demonstrated a likelihood he would prevail on his challenge to the Jail's publication restrictions or that such restrictions would cause irreparable harm because he had not subscribed to any print periodicals and Jail staff testified credibly that publications were allowed to prisoners. *Larkin*, 2020 U.S. Dist. LEXIS 35600, at *15-17, R&R approved and adopted by Order, 2020 U.S. Dist. LEXIS 34920 (D.N.H., Feb. 27, 2020). The court also held that Larkin lacked standing to litigate any claims that might be raised by those who send mail to the Jail. *Id*. at 28-29.

*v. Bazzetta*, 539 U.S. 126, 135 (2003)). Defendants provide HRDC no alternative means of communicating information to persons incarcerated in the Jail. HRDC cannot effectively communicate its written speech to incarcerated persons by telephone or in-person visits with prisoners in each of the over 5,000 prisons and jail in America. Wright Decl. ¶ 48. HRDC's message can be conveyed effectively only through print publications. *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (avenues for prisoners to obtain general information "should not be considered a substitute for reading newspapers and magazines"). Defendants leave HRDC without a practical way to provide timely, in-depth coverage to its intended audience.

The third *Turner* factor is the effect an accommodation of the constitutional right in question will have on incarcerated persons, prison staff, and on prison resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. at 414 n.14. In other words, the fact that other institutions are effectively able to accommodate the constitutional right in question indicates that a particular restriction is unnecessary.

Since its founding in 1990, HRDC has sent its materials to thousands of incarcerated persons nationwide. HRDC is unaware of its publications creating a security problem in any county, state, or federal detention facility, including other county jails in New Hampshire. Wright Decl. ¶ 13. This is strong evidence that the third *Turner* factor favors HRDC, and an arbitrary barrier to HRDC's communications irrationally interferes with core protected speech.

14

The final *Turner* factor is whether the regulation in question is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 90. Here, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ." *Id*. When a court finds a restriction on an incarcerated person's rights is an "exaggerated response" to prison concerns, the restriction cannot stand. *Id*. at 97–99.

That thousands of correctional facilities nationwide allow prisoners to receive HRDC mailings each month without experiencing security or other penological problems demonstrates the availability of ready alternatives to bans on HRDC's publications and correspondence. *See, e.g.*, *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011); *Morrison*, 261 F.3d at 905. Distribution of HRDC's mailings in these other facilities demonstrates that the censorship policy and practice at the Jail is both unnecessary and unreasonable—in the words of the Court, it is an "exaggerated response" to perceived prison concerns and cannot stand. *Turner*, 482 U.S. at 91.

The above analysis demonstrates that each of the *Turner* factors weighs in Plaintiff's favor. Therefore, Defendants' mail policy is an illegal intrusion on HRDC's First Amendment rights, and Plaintiff is likely to succeed on this claim.

## B. Due Process Claim

The Due Process Clause requires a correctional institution, each time it censors an incoming publication, to provide both the incarcerated person and the sender with notice and an opportunity to challenge the censorship to a person not involved in the initial censorship decision. *See, e.g.*, *Starr v. Knierman*, 474 F. App'x 785, 786 (1st Cir. 2012) (per curiam); *Jacklovich*, 392 F.3d at 433; *Cook*, 238 F.3d at 1152-53;

*Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996); *Martin v. Kelley*, 803 F.2d 236, 243–44 (6th Cir. 1986). Providing notice and an opportunity to be heard allows publishers to investigate and challenge First Amendment violations. *See Montcalm*, 80 F.3d at 108–09. If correctional facilities are allowed to simply throw away items that they choose not to deliver, it is impossible for publishers and incarcerated persons to know what materials are not being delivered or challenge the refusals. *See id.* at 109.

Other correctional facilities in New Hampshire provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. *See Thornburgh*, 490 U.S. at 406, 419 (upholding Federal Bureau of Prisons regulations); *Starr*, 474 F. App'x at 786 (discussing due process rights afforded by N.H. Code Admin. R. Cor. 301.05 and N.H. Department of Corrections Policy and Procedure Directive 5.26).

Although Defendants are constitutionally mandated to afford due process to publishers when censoring prisoner mail, they have plainly failed to do so. Even for the mailings that Defendants returned to HRDC, there was no notice of the reason for doing so and no opportunity to challenge the rejections. Wright Decl. ¶¶ 28, 30-31. Those mailings were returned through the U.S. Postal Service's return to sender service in the same manner as mail directed to someone no longer in custody, or simply misaddressed.[14] *Id.* ¶ 31. None of the returned mail bore any markings

---

[14] *Cf. Larkin*, 2020 U.S. Dist. LEXIS 35600, at *3 ("Supt. Brackett testified that, when

indicating the reason for its rejection. *Id*. ¶ 30. Moreover, none of the returned items contained any notice that the rejection could be appealed. *Id*. HRDC is also aware of other instances of censorship for which it received no notice, raising questions about similar items sent during same time period. *Id*. ¶ 28.

In sum, Defendants failed to provide notice of why HRDC's mail was rejected and failed to allow HRDC to appeal its rejection decisions. Thus, Defendants have violated HRDC's due process rights under the Fourteenth Amendment. *Cf. Starr*, 474 F. App'x at 787 (concluding that New Hampshire prisoner failed to show that he wasn't afforded adequate due process); *Novosel v. Wrenn*, No. 10-cv-165-PB, 2011 U.S. Dist. LEXIS 39174, at *26 (D.N.H. Feb. 16, 2011), R&R approved by Order, 2011 U.S. Dist. LEXIS 39174 (D.N.H. July 1, 2011).

## II. Defendants' Constitutional Violations Are Causing HRDC to Suffer Irreparable Harm.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato*, 699 F.3d at 10-11 (brackets in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007). One rationale behind this holding is that "chilled free speech and invasions of privacy, because of their intangible nature, [can] not be

---

such letters and cards are received in the SCDOC mailroom, officers return those letters and cards unopened to the sender, with a marking on the outside of the envelope that states, 'Return to Sender. Personal Mail No Longer Allowed.'"). Brackett also testified that the Jail initially returned personal mail inside a larger envelope containing a statement explaining the new policy. *Id*. at *8-9. HRDC's experience contradicts this testimony.

compensated for by money damages." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (citation omitted); *see also Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) ("[M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms." (citation omitted)). Accordingly, courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 699–700 (9th Cir. 2005) (affirming grant of permanent injunction of prison ban on non-subscription bulk mail and catalogs requested by incarcerated person); *Jones v. Caruso*, 569 F.3d 258, 277–78 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail policy).

The irreparable harm suffered by HRDC is concrete, severe, and ongoing. Defendants will continue to censor HRDC's publications and correspondence without due process, thwarting HRDC's speech on government policies, the rights of incarcerated persons, jail conditions, and the criminal justice system. Presumably, other publishers have been or will be censored in the same way. Accordingly, HRDC will continue to suffer irreparable harm without a preliminary injunction.

## III.   The Balance of Equities Weighs in HRDC's Favor.

Here, any potential injuries to Defendants are minimal and speculative. No great cost or expenditure of time is required to change the current policies to allow HRDC to deliver its mail to incarcerated persons and afford constitutionally mandated due process; indeed, this is the very process that is used at the Federal Bureau of Prisons and by the majority of jails and prisons across the country. Their experience

demonstrates that there would be no substantial harm to Defendants if they were enjoined from enforcing the mail policy now in effect.

In contrast, as noted above, the irreparable harm suffered by HRDC is concrete, severe, and ongoing. The law plainly requires Defendants to distribute publications to prisoners when mailed directly from publishers like HRDC, and it also requires that they provide due process of law to those whose speech they decide to censor. Accordingly, the balance of equities tips in HRDC's favor given the irreparable harm suffered by HRDC in the absence of a preliminary injunction, and the minimal effort necessary to vindicate its rights under the First and Fourteenth Amendments.

## IV.    A Preliminary Injunction Serves the Public Interest.

When deciding whether to issue an injunction, "courts of equity should pay particular regard for the public consequences." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1944)). As set forth above, there are substantial constitutional violations at issue here, and as such, the public interest would be best served by the issuance of a preliminary injunction. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest." (citations omitted)).

It is also in the public interest to allow incarcerated persons access to reading materials, which enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in jails. Wright Decl. ¶ 14. In addition, reading allows incarcerated persons to keep their minds sharp,

helping them prepare to become productive citizens when released back into society.

**V. The Bond Requirement Should Be Waived.**

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond. The First Circuit has recognized three factors relevant to the determination of whether such a bond is appropriate: (1) in non-commercial cases, "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant"; (2) "in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right"; and (3) the likelihood of success on the merits. *Crowley v. Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526, 551 (1984).

Several factors here warrant waiver of the bond requirement. The "harm" to Defendants if enjoined—*i.e.*, being forced to employ a constitutionally-permitted mail policy—is minimal and non-monetary, if it exists at all. Moreover, HRDC is a small nonprofit organization with a staff of approximately sixteen employees and does not have financial resources to post anything more than a nominal bond. Wright Decl. ¶ 49. Waiver of the bond requirement is also warranted here because Plaintiff is alleging violation of its fundamental rights under the Constitution, seeks to vindicate the public interest, and is likely to succeed on the merits.

## CONCLUSION

As set forth above, HRDC is likely to succeed on the merits of its constitutional

claims. HRDC is suffering and will continue to suffer irreparable harm to its First and Fourteenth Amendment rights that far outweigh any possible harm to Defendants from the issuance of an injunction. HRDC lacks any adequate remedy at law to address the ongoing violations of its constitutional rights. Finally, the public interest favors the protection of HRDC's constitutional rights. For these reasons, HRDC respectfully requests that this Court grant its motion for preliminary injunctive relief, waive the bond requirement, and enjoin the Defendants from censoring HRDC's magazines and informational brochures from the Jail during the pendency of this litigation.

Dated:        March 11, 2022                    Respectfully submitted,

Attorneys for Plaintiff Human Rights Defense Center

_____ */s/ Edward J. Sackman* _____

Edward J. Sackman, Bar No. 19586
Matthew Miller, Bar. No. 271594
670 N. Commercial Street, Suite 108
P.O. Box 1120
Manchester, New Hampshire 03105
(603) 623-8700
nsackman@bernsteinshur.com
mmiller@bernsteinshur.com

HUMAN RIGHTS DEFENSE CENTER
Daniel Marshall, Fla. Bar No. 617210*
Jesse W. Isom, Fla. Bar No. 98588*
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
dmarshall@humanrightsdefensecenter.org
jwisom@humanrightsdefensecenter.org

*Pro hac vice* applications to be filed.

21