UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Human Rights Defense Center

       v.

Board of County Commissioners
for Strafford County, New Hampshire, et al.

Civil No. 22-cv-091-LM
Opinion No. 2023 DNH 011 P

O R D E R

The case concerns the Strafford County House of Corrections's decision to ban all incoming inmate mail, including books and other publications, for security reasons.  Plaintiff, the Human Rights Defense Center ("HRDC"), sues the defendants, the Board of County Commissioners for Strafford County, New Hampshire, County Administrator Raymond F. Bower (individually and in his official capacity), Superintendent Christopher Brackett (individually and in his official capacity), and John and Jane Does 1-10, staff of the Strafford County House of Corrections (individually and in their official capacities) under the First and Fourteenth Amendments.[1]  Currently before the court is plaintiff's request for a preliminary injunction (doc. no. 3) to require the Jail to permit HRDC to send (via the U.S. mail) its paperbound books and periodicals to inmates housed at the Jail, and in the event the Jail rejects any of its mailings, to provide proper notice and opportunity to be heard.

---

[1] For simplicity the court refers to the defendants and the facility collectively as "the Jail."

At first blush, the Jail's complete ban on all incoming (non-legal) paper mail appears constitutionally problematic.  The ban prevents HRDC from sending (through "snail-mail") hard-copies of its books and periodicals to inmates, something HRDC has been doing for over 30 years.  However, the Jail makes HRDC's books and periodicals accessible to prisoners in hardcopy in the Jail's library.  Additionally, HRDC offers to place digital copies of HRDC's books and periodicals on the electronic tablets the Jail provides to all its inmates.

On October 17, 2022, the court held an evidentiary hearing on HRDC's motion.  HRDC did not present any witnesses and rested on the record.  Defendants presented one witness during the hearing: Superintendent Brackett.  The court found Brackett's testimony credible in every respect.  For the reasons explained below, HRDC has not shown that it is entitled to a preliminary injunction on either of its constitutional claims.

## BACKGROUND

I.   The Jail's Mail Policies

In 2017, the Jail grew increasingly concerned about the security risk posed by incoming inmate mail.  In particular, the Jail was struggling to prevent the introduction of illegal narcotics through paper that had been soaked, sprayed, or otherwise treated with illicit substances before being mailed to prisoners.  The Jail discovered narcotics on ordinary letter paper, in greeting cards, and in books mailed to prisoners from individuals in the community.  Narcotics introduction posed a risk to the health, safety, and security of the Jail's prisoners and staff.

It had been the Jail's practice to inspect incoming mail visually, but methods for disguising narcotic-treated paper had grown increasingly sophisticated and visual inspection often failed.  The Jail explored alternatives, but none met its needs.  As one example, it considered investing in an expensive machine to scan incoming mail for narcotics, but the machine could not detect fentanyl, which was the Jail's largest concern.  The Jail thus opted to continue with visual inspection.

On June 6, 2017, the Jail's concerns peaked when five inmates overdosed.  Three of them required hospitalization.  An investigation by the Strafford County Sheriff's Department revealed that all five prisoners likely ingested portions of the same piece of paper mailed to a prisoner from the outside that contained an unidentified illicit substance.

In response to the overdoses and the broader issue of narcotic introduction, the Jail enacted (on or about June 12, 2017) a policy which banned all "incoming personal inmate mail."  Doc. no. 3.  The purpose behind the policy was to prevent overdoses and other drug use in the facility.  The Jail also sought to protect members of its staff, who risked exposure to substances introduced through the mail, carried the emotional burden of responding to tragic overdoses, and faced added challenges of managing impaired prisoners.

The ban initially applied only to incoming personal paper mail.  The ban did not apply to incoming legal mail, nor did it restrict the ability of prisoners to send outgoing mail.  The Jail continued to accept books and periodicals mailed directly from publishers or retailers.  By July 2020, however, the Jail extended the ban to

include all incoming (non-legal) mail, including that directly from a publisher, like HRDC.

Brackett testified that the Jail adopted the 2020 publisher ban because of concerns that narcotics could be introduced through materials sent by publishers and warehouses.  He conceded that the concern was hypothetical, as he was not aware of a contaminated book coming directly into the Jail from a publisher.  He referenced incidents where inmates received contraband through the spine of a book or in a newspaper, but readily admitted that the materials did not come from publishers.

A.    Tablets

According to Brackett, the Jail did not enact either the ban on paper mail or the ban on materials from publishers until the Jail ensured it could provide, in its view, suitable alternative means for prisoners to correspond with the public and access reading materials.  The solution came in the form of electronic tablets.  Starting in June 2017, the Jail began providing each prisoner (with the exception of those held in maximum security and in the medical unit) a tablet free of charge.  Prisoners can use the tablets to communicate with people outside the prison by sending and receiving electronic messages, pictures, and videos, and making phone and video calls.  It costs $0.25 to send each electronic message, regardless of whether the message is incoming or outgoing. The messages have a character limit, but Brackett testified that it is rarely reached.  Senders can also attach a video clip to messages, which can last up to 29 seconds.

For individuals in maximum security or the medical unit who do not have access to tablets, the Jail prints out electronic messages sent to them through the messaging platform.  All prisoners are still permitted to send outgoing mail, so these prisoners can reply to the electronic messages via written letter.  Stamps are provided to those who cannot afford them.

Prisoners can also access reading materials through the tablets.  As of the date of the hearing, the tablets offered access to nearly 6,000 books and 2,000 magazines.  Because certain books are not available in digital format, the Jail maintains a small library of paper books that prisoners can request to borrow.  Prisoners can request books by writing to the programs department and sign books out in a manner like any other library.  Prisoners can keep the borrowed books in their cells.   Brackett testified that—since there is no avenue for prisoners to purchase books or periodicals for their own personal use—he is willing to purchase additional books for the library that are not accessible on the tablets.

The tablets also provide access to LexisNexis (a legal research platform) and to educational programs through which prisoners can earn certificates.  Finally, prisoners can use the tablets to make requests and complaints.  Prisoners can send messages internally to shift supervisors, the classification department, and the Superintendent himself, and externally to entities such as the American Civil Liberties Union.

Brackett testified that he believes the benefits of the tablet system far outweigh the drawbacks.  In his view, prisoners can now connect more easily and

frequently with members of the community.  Further, they have access to more reading materials and educational resources.  Brackett testified that, since the ban, there has been a decrease in positive drug tests at the Jail.  He also testified that the tablet system has been well received by the prisoners.

     B.    <u>Notice of the Policy</u>

When the Jail enacted the initial policy in 2017, it notified prisoners through a message on the tablets.[2]  HRDC concedes it became aware of the restrictive policy in 2017 when inmates began contacting it about the policy.  Doc. no. 3-2 ¶ 19; doc. no. 42 ¶ 5.  With respect to members of the public, the Jail posted a notice on its website stating "[a]fter careful consideration, the Department of Corrections will no longer accept incoming personal inmate mail."  Doc. no. 3-2 ¶ 18.  The notice also stated: "This change in policy is effective immediately and has been implemented to increase the safety and security of all inmates and staff at this facility. You can still correspond with those incarcerated via electronic messaging (email). You can learn more about this service at: www.connectnetwork.com."  <u>Id.</u>[3]  The Jail returned to the sender all disallowed mailings and included in the return mailing a letter explaining the policy.  Eventually, the Jail started sending the correspondence back via USPS's "return to sender" service without explanation.

---

[2] Brackett's July 2019 affidavit stated that prisoners were notified and given the opportunity to file a grievance any time a piece of personal mail or periodical is rejected.  It is not clear if that is still the policy today.

[3] HRDC had actual notice of this posting as of May 17, 2018.  Doc. no. 3-2 ¶ 18 ("HRDC staff accessed the Jail's website on May 17, 2018 and documented the notice.").

When the Jail extended the ban to include material from publishers in 2020, it posted a notice on its website at some point before July 2020.[4]   The notice states:

> We no longer accept donated books. Items may not be mailed in to the facility; inmates may access reading materials through the tablet system.  Items mailed to the facility will be returned to sender.

Doc. no. 3-1 at 6.  The Jail did not send out a letter explaining the policy to publishers whose mailings had been rejected.  Instead, the Jail sent the prohibited materials back to the publisher via USPS's "return to sender" service.  Although HRDC concedes the 2020 policy was posted on the Jail's website by July 2020, the record is not clear as to whether HRDC had actual notice of this 2020 policy.

## II.   Impact of 2020 Policy on HRDC

HRDC is a non-profit organization dedicated to educating incarcerated individuals and the public about the legal and civil rights of incarcerated people. HRDC furthers its mission through litigation, public education, and the distribution of materials about prisons and prisoners' rights.  In service of that mission, it produces and distributes two monthly publications: Prison Legal News and Criminal Legal News.  Prison Legal News is a soft-cover magazine that provides timely news and developments about the rights of incarcerated persons, prison conditions, and other related topics.  Criminal Legal News is a magazine providing updates on criminal justice-related issues broadly, including court rulings.  HRDC

---

[4]The exact date is unknown.  The parties agree that the notice was on the website in July 2020.

also distributes paperback publications covering similar topics, some of which it
self-publishes.  For example, HRDC self-publishes <u>The Habeas Citebook: Ineffective
Assistance of Counsel</u> and <u>Prisoners' Guerilla Handbook: A Guide to
Correspondence Programs in the United States and Canada</u>.  HRDC has distributed
over one million copies of <u>Prison Legal News</u> since 1990, and <u>Prison Legal News</u>
currently has thousands of subscribers in the United States and abroad.  HRDC
also mails informational brochure packets that explain HRDC's mission, the
different publications it offers, and includes a form through which prisoners may
place an order.  HRDC addresses all of the above referenced mailings to specific
individuals and sends them using the United States Postal Service with postage
fully paid.

Since its founding, HRDC has distributed its publications in more than 3,000
correctional facilities across the United States, including the Strafford County
Department of Corrections.  HRDC contends that communicating with prisoners via
paper correspondence—through its monthly periodicals in particular—is essential,
and "delays in delivery sap the magazines of their news value."  Doc. no. 3-2 ¶ 6.

In November 2020, HRDC attempted to mail a selection of its publications
(books and periodicals) to five prisoners in the Jail.  It also gave each prisoner a free
nine-month subscription to <u>Prison Legal News</u> and six-month subscription to
<u>Criminal Legal News</u>.  HRDC separately addressed and mailed each item.   All ten
of the books sent (in this case, five copies of <u>Protecting Your Health and Safety</u> and
five copies of <u>Prisoner's Guerilla Handbook</u>) were returned to HRDC through

USPS's "return to sender" service.  This is consistent with the notification the Jail placed on its website explaining the policy.  None of the other materials sent in this batch of mailings (including five copies of <u>Prison Legal News</u>, five copies of <u>Criminal Legal News</u>, five copies of a court ruling, and five copies of an informational brochure) was returned to HRDC.  HRDC sent four of the prisoners a follow-up letter; one prisoner responded stating that he did not receive any of the materials it mailed him.

Since this November 2020 mailing, HRDC continues to send monthly issues of its magazines and subscription-related correspondence to each prisoner still in the Jail to whom it had given free subscriptions.  In June 2021, a prisoner reached out to HRDC to complain that he had not received his magazine subscription. According to the prisoner's grievance form, a copy of which he attached to his letter to HRDC, the magazine was rejected because the "official policy states no newspapers, magazines, or outside mail."  Doc. no. 3-2 ¶ 27.  (emphasis removed).

While it is clear that HRDC had actual notice of the policy in effect as of 2017, it is likely that that HRDC also had actual notice of the broader 2020 ban. HRDC does not dispute that the Jail publicized the 2020 policy on its website.  And, Paul Wright, HRDC's Executive Director, admits that HRDC staff checked the Jail's website—which is how HRDC saw the Jail's posting of the 2017 policy.  Doc. no. 3-2 ¶ 18.  Mr. Wright describes himself as having "substantial expertise regarding the mail and correspondence policies of correctional facilities across the country" and having "carefully monitored all instances" in which a jail refuses to deliver HRDC

mail.  Id. ¶ 15.  Wright states he has "first-hand knowledge" about how HRDC mail is received and processed, including when the USPS uses "return to sender."  Id.

Certainly after its November 2020 mailing, HRDC had notice that the Jail was not permitting its books into the facility.  And, after hearing from a prisoner in June 2021, HRDC knew that no other publication was allowed.[5]  HRDC continued, however, to send its publications to the Jail.  Although HRDC indicates its staff at times telephoned the Jail, the only question HRDC apparently asked the Jail on those calls was whether a particular inmate was still incarcerated.  Doc. no. 3-2 ¶ 32.  HRDC does not indicate that it made any inquiry relative to the policy or available alternatives.

III.   The Lawsuit

The lack of any inquiry from HRDC is consistent with Brackett's testimony that he first learned about HRDC's dissatisfaction with the policy when he was served with the complaint initiating the lawsuit.  Since becoming aware of HRDC's dissatisfaction, Brackett has made attempts to remedy the situation.  First, Brackett purchased hard copies of HRDC's books and two-year subscriptions to both Prison Legal News and Criminal Legal News and made these available in the library.  He sent all prisoners a tablet notification about the availability of the

---

[5]In total, since 2017, HRDC can identify at least 39 mailings that were rejected by the Jail, including books, magazines, and promotional brochures. According to HRDC, "most" of the rejected mailings were returned to HRDC via USPS's "return to sender" service without explanation or an opportunity to appeal.  Doc. no. 3-1 at 9.

HRDC publications.  Second, he has offered to make electronic versions of <u>Prison Legal News</u>, <u>Criminal Legal News</u>, and HRDC's books available on the prisoners' tablets.  The undisputed evidence (library withdrawal records in addition to Brackett's testimony) showed that the library's current inventory is sufficient to meet the prisoners' demand for HRDC materials.  But, in the event demand for those books were to increase, Brackett testified that he would purchase more copies.  At the time of the hearing, the Jail had not yet received the periodicals it had ordered, but Brackett stated that he would notify prisoners via the tablet system of their availability upon their arrival each month.

HRDC maintains that the Jail's alternatives are insufficient.   HRDC states that its books are not available in digital form, and although it concedes that digitizing its periodicals is possible, it asserts that it is not currently financially feasible.[6]

## DISCUSSION

HRDC moves for a preliminary injunction against the Jail enjoining it from (1) violating HRDC's First Amendment rights by the "improper censorship" of HRDC's publications and correspondence and (2) violating HRDC's Fourteenth Amendment rights by failing "to provide notice or any opportunity to appeal rejections of HRDC's mailings."  Doc. no. 3.  The Jail objects, asserting that its mail policy passes First and Fourteenth Amendment muster.

---

[6]HRDC's counsel raised this financial hardship argument at the hearing but provided no evidence (neither data nor any analysis) to support the assertion.

I.      Preliminary Injunction Standard

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."  Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012).  To obtain a preliminary injunction, a plaintiff must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) the balance of hardships tips in the plaintiff's favor, and (4) public interest favors an injunction. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

II.     First Amendment Claim

    A.      Likelihood of Success

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This freedom extends to the right to distribute and receive literature.  Martin v. City of Struthers, 319 U.S. 141, 143 (1943).  Because "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," Turner v. Safley, 482 U.S. 78, 83 (1987), prisoners and their correspondents, including publishers, enjoy the protections of the First Amendment to the extent those protections "are not inconsistent with . . . the legitimate penological objectives of the corrections system."  Pell v. Procunier, 417 U.S. 817, 822 (1974).  Thus, a prison regulation that

impinges on a constitutionally protected right, such as the right to free speech, must be "reasonably related to legitimate penological interests."[7] Turner, 482 U.S. at 89.

Courts determine the validity of prison regulations using the so-called Turner factors: (1) whether there is "a valid, rational connection" between the regulation and the legitimate penological interest justifying it; (2) "whether there are alternative means of exercising" the impacted right; (3) what, if any, impact accommodating the right would have on other prisoners, staff, and resources generally; and (4) whether there are "ready alternatives" to the challenged regulation. Id. at 89-90.

In weighing these factors, courts must grant significant deference to prison administrators' professional judgment, as they "bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The burden is ultimately on the plaintiff to show the regulation is unreasonable. Id.

---

[7] Governmental regulations infringing on free speech are typically subject to a higher level of scrutiny. See Ashcroft v. ACLU, 535 U.S. 564 (2002); United States v. O'Brien, 391 U.S. 367 (1968). But, because the judiciary does not possess expertise in prison administration (that responsibility is delegated to the executive and legislative branches), the Supreme Court has held that constitutional challenges to prison regulations must be subject to a reduced level of scrutiny. Turner, 482 U.S. at 85. The deferential test formulated in Turner was designed to be "responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" Id. (quoting Procunier v. Martinez, 416 U.S. 396, 406 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 415 (1989)).

1.   <u>Rational Relationship</u>

The first <u>Turner</u> factor asks whether there is a "valid, rational connection" between the challenged policy and the legitimate penological interest justifying it. 482 U.S. at 89.  Courts have routinely found that maintaining prison security, deterring drug use within prisons, and providing incentives for good behavior are legitimate penological interests.  <u>See</u> <u>id.</u> at 90; Overton, 539 U.S. at 134; Beard v. Banks, 548 U.S. 521, 530 (2006).   Prison security in particular is "central to all other corrections goals." Thornburgh, 490 U.S. at 415 (quoting Pell, 417 U.S. at 823).  To be legitimate, a regulation should be applied in "a neutral fashion, without regard to the content of the expression." Turner, 482 U.S. at 90.

For the relationship between the regulation and its stated purpose to be reasonable, the logical connection cannot be "so remote as to render the policy arbitrary or irrational." Id. at 89-90.  Because of the significant deference granted to corrections officials, an official's professional judgment, without additional evidence corroborating it, satisfies the defendant's burden at this stage so long as the official's proffered justifications for the regulation are "logical."  See Kuperman v. Wrenn, 645 F.3d 69, 75 (1st. Cir. 2011) (noting that requiring defendants to "produce studies or independent expert testimony . . . overstates their burden" and that "courts do not require an actual breach of security before upholding a regulation designed to prevent it"); Josselyn v. Dennehy, 333 Fed. Appx. 581, 584-85 (1st Cir. 2009) (explaining that courts need not make "factual findings that the regulation will, in fact, serve its intended purpose").  The plaintiff must offer

evidence refuting the legitimacy of logical justifications offered by the defendant. Kuperman, 645 F.3d at 75.

### 2.   Alternative Means to Exercise the Right

The second Turner factor considers whether the institution provides prisoners with alternate ways to exercise the infringed-upon right.  These alternative means of exercising the right must be "available" to the prisoner, but they need not be "ideal."  Overton, 539 U.S. at 135.  For example, when a prison regulation limits a form of communication, the prison need not offer an identical alternative; it instead must offer other means of communication generally, such that the regulation does not result in a ban on expression altogether.  See Turner, 482 U.S. at 92 (upholding ban on inmate-to-inmate written correspondence because ban only applied to "a limited class of other people with whom prison officials [had] particular cause to be concerned" and did not "deprive prisoners of all means of expression").

The Supreme Court has acknowledged on multiple occasions that a "de facto permanent ban" on inmates' ability to communicate would create serious constitutional concerns.  Human Rts. Def. Ctr. v. Baxter Cnty. Ark., 999 F.3d 1160, 1166 (8th Cir. 2021) (citing Beard, 548 U.S. at 535 and Overton, 539 U.S. at 134). The Court has not, however, addressed how a limitation on communication with

prisoners may infringe upon the independent First Amendment rights of publishers.[8]  See Baxter Cnty., 999 F.3d at 1165.

### 3.   Impact of Accommodation

The third Turner factor examines the impact that possible accommodations would have on other prisoners, staff, and prison resources generally.  482 U.S. at 90. When the alternative means to exercising the right will cause a significant "ripple effect" on prison staff and other inmates, courts should be especially deferential to the judgment of prison administrators.  Id.  For example, if the right in question "'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike' . . . the courts should defer to the 'informed discretion of corrections officials.'"  Thornburgh, 490 U.S. at 418 (quoting Turner, 482 U.S. at 90, 92).

### 4.   Ready Alternatives

The final Turner factor asks whether there are "ready alternatives" to the policy at issue.  482 U.S. at 90.  If "obvious, easy alternatives" to the policy exist,

---

[8] Although the Supreme Court has not examined a regulation that bans publishers from mailing materials to prisoners, courts have repeatedly upheld "publishers-only" rules, which ban everyone but publishers from mailing books and periodicals to prisoners.  Courts have upheld such bans on the grounds that they reduce contraband introduction without depriving prisoners access to reading materials altogether.  See, e.g., Bell v. Wolfish, 441 U.S. 520, 549-50 (1979); Kines v. Day, 754 F.2d 28, 30 (1st Cir. 1985); see also Stow v. Warden, No. 93-1869, 21 F.3d 420, 1994 WL 108929, at *3 (1st Cir. Mar. 31, 1994) (unpublished table decision); Avery v. Powell, 806 F. Supp. 7, 8–9 (D.N.H. 1992).

that may indicate it is an "exaggerated response" to a prison's penological concern. Id. at 91.  But, this inquiry is not a "least restrictive alternative" test—for a policy to be upheld, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id.  Instead, if prison officials "rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm" a regulation is not an "exaggerated response." Thornburgh, 490 U.S. at 419.  The existence of an "alternative that fully accommodates the [plaintiff's] rights [at] a de minimis cost to valid penological interests" can refute the existence of a reasonable relationship. Turner, 482 U.S. at 90–91.

HRDC has not shown a likelihood of success on the First Amendment claim. Under all four prongs of the Turner test, the Jail's actions survive constitutional scrutiny.

First, with respect to the existence of a rational relationship between the policy and penological interest justifying it, the court finds a sufficient logical connection.  As an initial matter, the penological purposes behind the Jail's policy are legitimate.  The concerns articulated by Superintendent Brackett—security, safety, and preventing illicit drug use—are legitimate penological interests under Turner.  See Thornburgh, 490 U.S. at 415 (noting that prison security in particular is "central to all other corrections goals"); Larkin v. Strafford Cnty. Dep't of Corr., Superintendent, No. 19-cv-102-LM, 2020 WL 981289, at *8 (D.N.H. Jan. 13, 2020)

(finding that "restricting inmate access to opioids like Suboxone and fentanyl in particular are legitimate penological interests").

Additionally, the relationship between those legitimate penological interests and the policy at issue is reasonable. Although the Jail's concern about publisher materials containing contraband was hypothetical in nature, the possibility that such a thing could happen makes logical sense. See Kuperman, 645 F.3d at 75 (noting that defendants meet their burden under the first prong if their proffered justification for a prison policy is "logical"). Turner does not require the Jail to prove prior instances of narcotics introduction through HRDC or other publishers before enacting a policy to preempt such an eventuality. See id. (explaining that "courts do not require an actual breach of security before upholding a regulation designed to prevent it"). And there was nothing hypothetical about the concerns that contraband (a) had entered the Jail through books and paper materials mailed to inmates, and (b) had caused significant harm to inmates and disruption to jail security. See Josselyn, 333 Fed. Appx. at 584-85 (noting courts need not make "factual findings that the regulation will, in fact, serve its intended purpose").

To find the Jail has not met its burden here would require the court to second-guess the Jail's policy decisions and the strategies it has developed to cope with this novel method of introducing drugs into the Jail. See Overton, 539 U.S. at 132 (noting the court must accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most

appropriate means to accomplish them").  After weighing the evidence and affording
deference to the Jail, the court finds this first prong of <u>Turner</u> is satisfied.

    The Jail's policy becomes more reasonable when assessing the second <u>Turner</u>
factor: whether the Jail provides alternative methods of distributing HRDC's
publications to the inmates.  The Jail has offered compelling alternatives.  First, the
Jail has purchased hard copies of HRDC books and two-year subscriptions to its
periodicals for its library, which—as of the date of the hearing—has been sufficient
to meet prisoners' needs.  Second, the Jail has offered to make HRDC's periodicals
and books available on each prisoner's electronic tablet.  The Jail has more than
satisfied this second prong.  <u>See</u> <u>Crime Justice & America v. Honea</u>, 876 F.3d 966,
976 (9th Cir. 2017) (finding <u>Turner</u> satisfied where jail provided hard copies of
publisher's magazine in its library and made a digital copy available on its 31
electronic kiosks—1 kiosk for every 18 inmates); <u>Human Rts. Def. Ctr. v. Henderson
Cnty.</u>, 20-CW-159, 2022 WL 14740236, at *8 (W.D. Ky. Oct. 25, 2022) (finding
<u>Turner</u> satisfied where jail provided hard copies and electronic access to HRDC's
publications).  For these reasons, the court finds the second <u>Turner</u> factor weighs in
favor of the Jail.

    The third and fourth <u>Turner</u> factors (the impact of accommodating HRDC's
right and the existence of ready alternatives) also weigh in the Jail's favor.  Before
instituting a ban on any incoming mail, the Jail tried less restrictive alternatives,
such as an expensive scanning machine that failed to detect fentanyl—a drug whose
entry the Jail is trying to prevent.  <u>Turner</u>, 482 U.S. at 91 (noting that the absence

of easy, obvious alternatives indicates the policy is not an "exaggerated response" to the issue).  The Jail would need to employ its staff to conduct visual scans on all incoming mail from a publisher.  See Prison Legal News v. Sec'y, Fla. Dep't of Corr., 890 F.3d 954, 973 (11th Cir. 2018) (finding unduly burdensome alternative which would require jail to "allocate more time, money, and personnel in an attempt to detect and prevent security problems engendered by . . . the magazines").  The Jail has concluded that this is neither as effective nor as safe as allowing inmates access to reading material via their tablets.  Since 2017, the Jail has elected to use a tablet system to communicate with its inmates.  The evidence is undisputed that this system has provided a solution to the problems the Jail was experiencing with inmate mail.  And, the tablet system permits all inmates at the Jail unlimited digital access to HRDC publications.[9]

In sum, HRDC has not shown a likelihood of success on its First Amendment claim.  When a plaintiff cannot establish a likelihood of success on the merits, the court need not address the remaining three preliminary injunction factors.  LeBeau v. Spirito, 703 F.2d 639, 645 (1st Cir. 1983).

The court now moves to HRDC's Fourteenth Amendment claim.

---

[9] HRDC filed this lawsuit without first discussing alternatives with Brackett. As such, HRDC claimed that "[w]ithout the ability to mail prisoners these items, HRDC has no way to exercise its right to communicate with incarcerated persons in the Jail."  Doc. no. 3-1 at 9.  The option of placing digital copies of HRDC publications on each inmate's tablet gives HRDC the opportunity to communicate with more inmates than the method it seeks in this lawsuit.

III.   Fourteenth Amendment Claim

    A.   Likelihood of Success

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To establish a due process violation, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property.   The Supreme Court has recognized that publishers have a constitutional right to communicate with prisoners to the extent that it does not interfere with a prison's legitimate penological interests.  See Thornburgh, 490 U.S. at 407.  After showing a deprivation of a protected interest, a plaintiff must then show that the interest was deprived without constitutionally adequate process.  Zinerman v. Burch, 494 U.S. 113, 125–26 (1990).

HRDC argues that the Jail violated its procedural due process rights by not affording adequate notice and opportunity to be heard before rejecting its publications.  See Martinez, 416 U.S. at 418.  The parties do not dispute that publishers like HRDC have a protected interest in communicating with prisoners, nor do they dispute that some amount of process is due when there is a deprivation of a protected interest.  Thus, the question the court must resolve is what level of process HRDC is owed and whether the Jail provides it.

Because the policy at issue here is based on "simple and clearcut criteria" that apply across-the-board to all incoming publications, the court evaluates the sufficiency of the process under Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  See

Starr v. Knierman, 474 Fed. Appx. 785, 786 (1st Cir. 2012); see also Baxter Cnty. Ark., 999 F.3d at 1167 (applying Mathews rather than Procunier v. Martinez to neutral jail policy regarding incoming mail); Henderson Cnty., 2022 WL 14740236, at *13 (same).

> Under Mathews, courts consider three factors:
>
>> (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

424 U.S. at 335.  Then, based on the outcome of the balancing test, the court either finds that the existing safeguards sufficient or requires additional safeguards to bring the process in conformity with the Fifth and Fourteenth Amendments.  Id. at 348-49.

The first prong of the test is easily met: HRDC has a private interest in communicating with prisoners "to spread its message and try to disseminate more of its publications."  Henderson Cnty., 2022 WL 14740236, at *14 (internal quotations omitted).  This principle is well established.  See, e.g., Perry v. Sec'y, Fla. Dep't of Corr., 664 F.3d 1359 (11th Cir. 2011); Montcalm Pub. Corp. v. Beck, 80 F.3d 105, 109 (4th Cir. 1996).

The next consideration is the "risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  Mathews, 424 U.S. at 335.  Under the policy

22

currently in effect, when the Jail receives mail from HRDC, the Jail's policy is to return the mail via the USPS "return to sender" service.  There is no risk of "erroneous deprivation" of an interest through that procedure since the ban applies across-the-board for all incoming publications.  Further, additional procedural safeguards would be of no value to HRDC, which is already aware that its mailings will be rejected and why.  "[D]ue process does not require copy-by-copy notice if later denials of identical publications amount to the routine enforcement of a rule with general applicability."  Baxter, 999 F.3d at 1167.  Thus, the court finds that with respect to HRDC specifically, the Jail's policy is sufficient under the second Mathews factor.

The third Mathews factor considers whether "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Mathews, 424 U.S. at 335.  The government's interest here is compelling.  The Jail's current policy is designed to enhance and maintain prison security and reduce drug use within the jail.  The jail designed the policy to be cost-effective and efficient as well.  Requiring the Jail to institute a formal appeal process would be unduly burdensome and, in light of the nature of the Jail's across-the-board policy, would not serve any purpose. Cf. Prison Legal News v. Livingston, 683 F.3d 201, 223 (5th Cir. 2012) ("Such subsequent denials are non-individualized—they neither reconsider the content of the denied book nor depend on the particular sender or addressee—so it is not even

clear that due process is implicated by such decisions."). This factor also weighs in favor of the Jail.

In short, HRDC has not shown that the existing procedures fail to protect its liberty interest, or that "the additional essentially duplicative notice and appeal procedures [it] seeks would improve the prison's decisionmaking process, such that imposing costs on the state to provide such procedures would be warranted." Starr, 474 Fed. Appx. at 787. The Fifth Circuit would go further, as it explained in a similar context:

> Due process pertains to the right to participate in government decision making. The "notice" required by due process is notice of when, where, and how one can be heard before a decision becomes final. . . . The right to receive notice exists only to effectuate the right to be heard, and therefore is inapplicable where a party has no right to participate in the decision-making process.

Livingston, 683 F.3d at 224. The Fifth Circuit held in Livingston that "[g]iving notice to a sender that his communication has been rejected may be a reasonable courtesy, but such notice is not a requirement of due process." Id.

Based on the totality of circumstances, the court finds that HRDC has not met its burden of showing a likelihood of success on the merits of its due process claim.[10]

---

[10] Only the policy currently in effect (the 2020 ban) is relevant to the preliminary injunction.

B.    <u>Irreparable Harm</u>

Even if HRDC could satisfy the likelihood of success prong, it could not show any irreparable harm from the denial of its procedural rights.  Irreparable harm is a "necessary threshold showing for awarding preliminary injunctive relief." <u>Matos ex rel. Matos v. Clinton School Dist.</u>, 367 F.3d 68, 764 (1st Cir. 2004).  The plaintiff must show that absent a court injunction, it is "likely to suffer irreparable harm before a decision on the merits can be rendered."  <u>Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011).

An alleged denial of procedural due process rights does not automatically trigger a finding of irreparable harm.  <u>Pub. Serv. Co. of New Hampshire v. Town of W. Newbury</u>, 835 F.2d 380 (1st Cir. 1987).  To prove irreparable harm, "a plaintiff must show that it has experienced 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" <u>Leisure Time Cruise Corp. v. Town of Barnstable</u>, 62 F. Supp. 2d 202 (D. Mass. 1999) (quoting <u>Ross– Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996)).  Further, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." <u>Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).  Finally, a "delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."  <u>Id.</u> at 163.

Here, HRDC has not shown that it will suffer irreparable harm in the absence of a preliminary injunction.  The record shows that HRDC has notice of the current policy and how it is applied.  Thus, it will not suffer harm if the Jail does not send it a letter explaining the policy every time it rejects HRDC's mailings in the future.  See Larkin, 2020 WL 981289, at *29.

Because HRDC has shown neither a likelihood of success on the merits nor irreparable harm, the court denies HRDC's motion for a preliminary injunction on its Fourteenth Amendment claim.

## CONCLUSION

For the above reasons, HRDC's motion for preliminary injunction (doc. no. 3) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 2, 2023

cc:      Counsel of Record.